```
                                                              O
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EC DATA SYSTEMS, INC., | ) | Case No. CV 12-07544 DDP (AJWx) |
| | ) | |
|         Plaintiff, | ) | CLAIM CONSTRUCTION ORDER |
| | ) | |
|   v. | ) | OPENING CLAIM CONSTRUCTION BRIEFS |
| | ) | AT DOCKET NOS. 61-62 |
| j2 GLOBAL, INC., ADVANCED MESSAGING TECHNOLOGIES, INC., | ) ) ) | |
| | ) | |
|         Defendants. | ) | |
| _____ | ) | |

**I. Background**

This claim construction order pertains to two cases, Case No. 11-CV-7904 DDP ("the Vitelity Action") and Case No. 12-CV-7544 DDP ("the EC Data Action") (collectively the "Actions"). j2 Global Communications, Inc. and Advanced Messaging Technologies, Inc. (collectively "j2") are parties to both Actions. A total of five terms have been identified for construction, with EC Data Systems, Inc. ("EC Data") (the plaintiff in the EC Data Action) and Vitelity Communications, LLC ("Vitelity") (the defendant in the Vitelity Action) proposing the same construction for three of these terms. j2 is the owner of U.S. Patent Numbers 6,208,638 ("'638 Patent");

6,350,066 ("'066 Patent"); 6,597,688 ("'688 Patent"); and 7,020,132 ("'132 Patent").  j2 is asserting that Vitelity and EC Data have infringed some or all of these patents.

The technology at issue relates to user receipt and transmission of facsimile and telephone messages over the Internet, and ways of making those messages available to users.  The '066 Patent describes a method or system for making messages available to users over the internet.  The '638 Patent describes a method for transmitting messages to users in email form.  The '688 and '132 Patents, which share common specifications and drawings, relate to sending messages over the internet that can be received by a facsimile machine.  The four patents can generally be grouped into two categories: Patents '066 and '638 relate to a message being received by a user, or an "inbound" message; Patents '688 and '132 relate to a message that a user is sending, or an "outbound" message.

## II. <u>Legal Standard</u>

A patent infringement analysis involves two steps: (1) determining the meaning and scope of the patent claims asserted to be infringed; and (2) comparing the properly construed claims to the accused device.  <u>See generally</u> <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370 (1996).  The first step in this sequence is presently before the Court.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted).  The

construction of a particular patent claim term presents a question of law, to be decided by the Court.  Markman, 517 U.S. at 391.

The starting point for claim construction is a disputed term's ordinary meaning.  Phillips, 415 F.3d at 1313.  For claim construction purposes, ordinary meaning is the meaning that a person of ordinary skill in the art would attribute to a claim term in the context of the entire patent at the time of the invention, i.e., as of the effective filing date of the patent application.  ICU Med., Inc. v. Alaris Med. Sys., Inc., 558 F.3d 1368, 1374 (Fed. Cir. 2009).

The claims do not stand alone; a person of ordinary skill in the art "is deemed to read [a] claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  Phillips, 415 F.3d at 1313-14 (emphasis added).  Accordingly, the specification is "the primary basis for construing the claims" in light of the "statutory requirement that the specification describe the claimed invention in full, clear, concise, and exact terms."  Id. at 1315 (internal quotation marks omitted) (emphasis added).

In determining the proper construction, the claim language, specification, and prosecution history – together referred to as the "intrinsic evidence" – are of paramount importance.  Id. ("[T]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." (internal quotation marks omitted)).  Consistent with this principle, courts have recognized that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise

3

possess. Id. at 1316. In such cases, the inventor's lexicography governs. Id. In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. Id.

Additionally, "[a] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick, 573 F.3d 1290, 1297 (Fed. Cir. 2009).

While a court interprets claim terms in light of the specification, it should generally not "import[] limitations from the specification into the claims absent a clear disclaimer of claim scope." Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1373 (Fed. Cir. 2007). "[T]he distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice." Phillips, 415 F.3d at 1323. In walking this "tightrope," Andersen, 474 F.3d at 1373, the court hews to the question of "how a person of ordinary skill in the art would understand the claim terms." Phillips, 415 F.3d at 1323.

A court's ultimate goal is to construe the disputed terms in a manner consistent with the way the inventor defined them and a person of ordinary skill in the art would understand them. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Phillips, 415 F.3d at 1316 (internal quotation marks omitted).

///
///

**III. Analysis**

    **A. Claim terms for the '638 Patent**

        1. <u>"incoming call signal includes a particular inbound address uniquely associated with a user account"</u>

| j2's Construction | EC Data's and Vitelity's Construction | Court's Construction |
|---|---|---|
| the inbound address of an incoming call can only be associated with one user account | the inbound address of an incoming call can only be associated with one user account, and each user account can only be associated with one inbound address | the inbound address of an incoming call can only be associated with one user account |

    j2's proposed construction is the same one that j2 offered and this Court adopted when this term was previously construed in <u>j2 Global Communications, Inc. v. Captaris, Inc.</u>, No. 09-CV-4150 DDP (the "Captaris Action").  EC Data's and Vitelity's proposed construction is the same one that the Court rejected in the Captaris Action.  In that Action, the Court noted:

> [T]he court finds no indication that the Patent is limited in the way Defendants suggest.  It is clear that each inbound address is uniquely associated with a user; however, the claim is silent as to whether a user is equally limited to one inbound address.  The court is persuaded that j2's proposed construction aligns with the most "natural[]" reading of the term. [<u>Phillips</u>, 415 F.3d at 1316.]  Defendants' construction would import limitations not apparent in the claim or specification and, which the court considers severely narrow and outside the realm of what one in the ordinary art would have understood the claim terms to include.

(Captaris Claim Construction Order at 19:8-20, Docket No. 205 in the Captaris Action.)  EC Data and Vitelity state that j2 disavowed its proposed construction during re-examination of the '638 Patent

5

when it made the following statement: "The foregoing portion of the written description makes clear that the user account and the inbound address (both used exclusively in the singular case) are uniquely associated-there is nothing in the '638 patent that suggests that a single inbound address may be associated with multiple user accounts." (Spohn Decl. Ex. I at 4-5.)  However, in the above quote, the words after the dash seem to indicate that the purpose of the Patent Owner's statement was to explain that an inbound address is associated with only one user account, not that, as EC Data and Vitelity suggest, each user account can only be associated with one inbound address.  Thus, j2 did not make a "clear and unmistakable disavowal of scope," as Vitelity and EC Data suggest.  <u>Hedrick</u>, 573 F.3d at 1297.

During reexamination, j2 further stated:

> [W]hile a user account can have multiple destination addresses, it is clear that only a single inbound address (e.g., a single telephone or facsimile number) is associated with a particular user account.  The '638 patent is very clear in this regard, and it only makes sense - it is necessary for a user to have an inbound address that is uniquely associated with a user account so that messages directed to the inbound address will be received by the user, and only by the user, at one or more destination addresses.

(Spohn Decl. Ex. I at 5.)  As with the previous quote, the statement after the dash indicates that an inbound address must be associated with only one user account.  The Court previously rejected the same arguments that EC Data and Vitelity now make in a previous case.[1]  Because j2 did not make a "clear and unmistakable

---

[1] Captaris and EasyLink, who participated in coordinated claim construction proceedings, advanced the same arguments, with the same citations to the '638 Patent's reexamination history that EC Data and Vitelity now cite. (Bernstein Suppl. Dec. Ex. J at 17; Ex.
(continued...)

disavowal of scope during prosecution," the Court sees no reason to depart from the construction it adopted in the Captaris action. Hedrick, 573 F.3d at 1297.[2]

    2. "<u>redirecting the first incoming call signal from the first communications server to a second communications server</u>"

| j2's Construction | EC Data's and Vitelity's Construction | Court's Construction |
|---|---|---|
| directing to the second communications server a call that was originally directed to a first communications server | moving the first incoming call signal from the first communications server to a second communications server, where duplicate user information is provided to the second communication server | directing to the second communications server a call that was originally directed to a first communications server |

There are two disputes regarding the instant term. The first is whether, as EC Data's and Vitelity's construction implies, the incoming call signal must actually reach the first communications server before it goes to the second communications server. The

---

[1](...continued)
K at 11; Ex. L at 26-27; Ex. M at 21.)

[2]Additionally EC Data's and Vitelity's reliance on the Examiner's response to j2's statements during re-examination are of no avail. The Examiner's unilateral reaction to j2's statement does not bind j2. <u>Salazar v. Procter & Gamble Co.</u>, 414 F.3d 1342, 1347 (Fed. Cir. 2005). For these reasons, the Patent Owner's statements to the Examiner also do not amount to a disavowal of patent scope under <u>Biogen Idec, Inc. v. GlaxoSmithKline LLC</u>, 713 F.3d 1090 (Fed. Cir. 2013).

7

second is whether the term requires that duplicate user information be provided to the second communications server.

Regarding the first dispute, EC Data and Vitelity state that the term to be construed, itself, implies that the information reaches the first communication server and is then redirected to a second. However, redirecting only implies that information was going one place but ended up in another, not necessarily that it went to one place first and then another. See Merriam-Webster's definition of "redirect": "to change the course or direction of," available at http://www.merriam-webster.com/dictionary/redirect.

Additionally, the '638 Patent's preferred embodiment indicates that the invention was designed to redirect information without ever reaching the first server, since problems may exist with that server that prevent it from receiving information: "Also, it should be noted that the call will only come from switch 140 to communications server 150 if there are no problems with the line. Otherwise the call will get routed to a different communications server." (Bernstein Decl., Ex. A, col. 5, lines 46-50.) Thus, Vitelity's and EC Data's proposed construction would exclude the preferred embodiment, a result that is "rarely, if ever, correct." Playtex Prods.,Inc. v. Procter & Gamble Co., 400 F.3d 901, 904 (Fed. Cir. 2005).

As to the second dispute, in response to "the Examiner['s] state[ment] that the '638 patent lacks support for a limitation requiring that an inbound address remain unchanged during redirection of a message signal to a second communications server," (Spohn Decl. Ex. I at 5-6 (Patent Owner responding to Spohn Decl.

Ex. H at 2)), the Patent Owner made the following statement during reexamination:

> [A]t column 5, lines 10-28, the '638 specification provides that a trunk line interface (reference numeral 152 in FIG. 2) of a communications server (reference numeral 150 in FIGS. 1 and 2) "receives signals indicating the **circuit destination address** of the incoming call." This "circuit destination address" is the destination on the circuit switched network, and is the same as the "inbound address" described elsewhere in the '638 patent and recited in the claims. As noted above, this is the telephone or facsimile number assigned to a user and uniquely associated with the user account. Much of the remainder of column 5, including the discussion at lines 47-62 previously cited by the Patent Owner, addresses redirecting a call to an alternate communications server capable of allocating necessary resources to process the incoming message. <u>This redirecting includes providing the alternate server with "duplicate user information" required to process the call.</u> <u>See column 5, lines 54-62.</u>

(Spohn Decl. Ex. I at p. 6 (bolded emphasis in original and underlined emphasis added).) EC Data emphasizes that the Patent Owner's above statement requires the phrase "where duplicate user information is provided to the second communication server" be incorporated into the definition of the instant term. The Court disagrees.

In the above quote, the Patent Owner was answering whether "an inbound address remain[ed] unchanged during redirection," not whether user information was required to be duplicated. Because the duplication language in the above was not necessary to answer the Patent Examiner's inquiry, the Patent Owner did not "clear[ly] and unmistakabl[y]" affirm a duplication requirement during reexamination. See Hedrick, 573 F.3d at 1297. Additionally, the duplication language above cites to the specification, thus indicating that the language was explanatory, not a disavowal of claim scope. See Andersen, 474 F.3d at 1373 (holding that courts

9

should generally not "import[] limitations from the specification into the claims absent a clear disclaimer of claim scope").³ For these reasons, the Court will not incorporate the duplication-related language that EC Data and Vitelity suggest.

3. "Audio Message"

| j2's Construction | Vitelity's Construction | Court's Construction |
|---|---|---|
| an audible message that contains a voice or facsimile message | a message, such as a voice message but not a facsimile message, that is intended to be heard by a recipient | an audible message that contains a voice or facsimile message |

EC Data does not ask the Court to construe this term. j2's construction is the same as what it proposed and the Court adopted in the Captaris Action. (Captaris Claim Constriction Order at 22-24.) Vitelity's construction is the same construction that the Court rejected in the Captaris Action. (Id.)

Vitelity correctly notes that the specification, at times, makes a distinction between an audio and facsimile message. However courts should generally not "import[] limitations from the specification into the claims absent a clear disclaimer of claim scope." Andersen, 474 F.3d at 1373. Vitelity also focuses on a statement that the Patent Owner made during patent prosecution on June 7, 1999:

---

³It appears that the Examiner may have taken the Patent Owner's above block-quoted response as affirming a duplication limitation. (See Spohn Decl. Ex. J at 4.) For the same reasons that are discussed in footnote 2, however, the Examiner's statements do not change the Court's conclusion.

10

>
> Richardson [the prior art being distinguished] does not anticipate the features present in the currently amended claims to allow distribution of <u>voicemail messages</u> via the use of electronic mail messages, which involves the conversion of [an] incoming audio message into a digital representation of said audio message; and sending said digital representation of said audio message to [an] electronic mail address in an electronic mail message. In addition, Richardson also does not anticipate the association of a recipient's phone number to an e-mail address to allow an incoming voice call to be delivered to the recipient by determining a user account and an electronic mail address associated with [an] inbound address. (Emphasis added).[4]

The above quote, though, is about voicemail. The prior art being distinguished, the Richardson patent, concerns voicemail, not facsimiles. (Bernstein Suppl. Decl., Ex. R.) Indeed, the words "fax" or "facsimile" do not appear in the Richardson patent. (<u>Id.</u>) Accordingly, nothing in the above quote indicates that j2 made a "clear and unmistakable disavowal [regarding facsimiles] during prosecution." <u>Hedrick</u>, 573 F.3d at 1297 (Fed. Cir. 2009).

By contrast, there is substantial evidence that "audio message" includes a "facsimile message." Claim 11 of the '638 Patent states "[t]he system of claim 1, where the audio message is a facsimile message and the digital representation of the audio message is a graphics file." (Bernstein Decl., Ex. A, col. 7, lines 54-56 (emphasis added).) Claim 12 claims "[t]he system of claim 1, where the message processing resource further

---

[4] The Court notes that the specification and June 7 response were previously cited by Captaris and EasyLink, and the Court did not find the cites persuasive. (Bernstein Decl. Ex. P; <u>Id.</u> Ex. L at 33; Captaris Claim Construction Order.) Regarding the June 7 response, although Vitelity quotes the language block quoted above, it is unclear where in the record this quote can be found. (Vitelity Opening Claim Construction Brief at 7:6-19 (quoting the above block-quoted language but not citing to it). Nevertheless, since j2 does not dispute its accuracy, and since j2 has the better interpretation of the quoted language, the Court need not decide whether this uncited quote is admissible.

11

comprises a processor to: determine if the audio message contains a facsimile message or a voice message; and, digitize the audio message if the audio message contains the voice message and receive the facsimile message if the audio message contains the facsimile message." (Bernstein Decl., Ex. A, col. 7, line 57 – col. 8, line 5 (emphasis added).) Thus, the term audio message includes a facsimile message.

**B. The '066 Patent**

1. "user-specific message storage area"

| j2's Construction | EC Data's and Vitelity's Construction | Court's Construction |
|---|---|---|
| an area within a storage medium that stores messages for a recipient in a manner that identifies the message uniquely to the recipient | an area within a storage medium that stores messages for an intended recipient in a manner that identifies the message uniquely to the intended recipient and which is accessible only by the intended recipient | an area within a storage medium that stores messages for a recipient in a manner that identifies the message uniquely to the recipient |

j2's construction is the same one that it proposed and the Court adopted in the Captaris Action. (Captaris Claim Construction Order at 15.) The parties offer nearly identical constructions, aside from the clause beginning with "and which" in EC Data's and Vitelity's construction. Before that clause, the only difference between the parties' constructions is that EC Data and Vitelity state that "intended recipient" is superior to a definition that only states "recipient." The Court finds that the word "intended"

12

is unnecessary surplusage. The recipient is, of course, the entity to which the message is directed. Adding unnecessary verbiage is likely to confuse the jury, and, thus, frustrate one of claim construction's chief purposes. <u>Whitserve LLC v. Computer Patent Annuities N. Am., LLC</u>, No. CIV.3:04-CV-01897(CF), 2006 WL 1273740 (D. Conn. May 9, 2006) ("[T]he purpose of a Markman hearing is to construe the patent claims so that the Court can instruct the jury on the meaning of the patent.")

There is also no need to add a requirement that a message be "accessible only by the intended recipient" to the instant term. Although EC Data and Vitelity submit evidence the Patent Owner stated during reexamination that "access to the mailbox is limited to the intended recipient," (Spohn Decl. Ex. EE at 3, cl. 48 & 99), the instant term does not contain the word "mailbox." Thus, the Patent Owner's statements about the term "mailbox" have at best inconclusive relevance to the instant term. Additionally, if a message were "accessible only by the intended recipient," then individuals (such as a colleague or friend) whom the recipient has given his password to could not access the messages, nor could a repairperson for that matter. Such a result would be absurd. While the '066 patent specifically discusses the confidentiality of messages, ('066 Patent at 5:7-9), the invention did not disavow that sometimes someone other than the recipient may access the message.

  **C.**  **The '688 and '132 Patents**

   1. <u>"Message queue"</u>

///

///

13

| j2's Construction | EC Data's Construction | Court's Construction |
|---|---|---|
| a storage area for storing messages for retrieval using a first-in, first-out policy | a data structure implemented within a processing server that stores multiple request messages received from customers for retrieval using a first-in, first-out policy | the organization of messages for retrieval using a first-in, first-out policy |

Vitelity has not proffered a construction for the instant term. Three disputes underlie the parties' proposed constructions.

First, the parties dispute whether a message queue is a data structure or a storage area. In arguing that "data structure" should not be incorporated into the Court's construction, j2 states that the term will confuse the jury. The Court agrees. One of the purposes of a Markman hearing is to adopt constructions that will facilitate juror understanding. <u>Dura Global Technologies, Inc. v. Magna Donnelly Corp.</u>, No. 2:07CV10945-SFC-MKM, 2010 WL 4259615 (E.D. Mich. Oct. 25, 2010) ("Dura seems to misunderstand the purpose of a Markman hearing, which is to translate the terse language of the claims that are understandable to a person of ordinary skill in the art into a form that would be readily understood by the jury . . .") However, "storage area" is at best minimally less confusing. Because a "queue" is essentially an organization system, the Court's adopted construction is likelier to aid the jury.

Nor does the reexamination history, as EC Data suggests, compel a different result. During reexamination, the Patent Examiner defined "queue" as a "multi-element <u>data structure</u> from

14

which elements (by strict definition) can be removed only in the same order in which they were inserted; that is, it follows a first-in first-out (FIFO) constraint." (Spohn Decl. Ex. OO at 16.) The Patent Owner argued that even if "for purposes of the present response that the Examiner's definition of 'queue' is correct the term 'message queue' as used in the '132 patent must incorporate the notion that the queue is a data structure configured to contain multiple messages . . ." Id. (Emphasis in original.) Thus, the Patent Owner did not affirm a data-structure requirement. The Patent Owner only argued that whatever definition is given to "queue," the term must be modified by "message." Because the Patent Owner's argument was not a "clear and unmistakable disavowal of scope during prosecution," the Court will not adopt the data-structure requirement. Hedrick, 573 F.3d at 1297.

Second the parties dispute whether a message queue must be implemented within the processing server. EC Data relies on a diagram in the '688 Patent's specification and language within the specification that states the "message queue" is included in the "processing server." ('688 Patent at Fig. 2 and 3:15.) However, the '688 Patent indicated that it did not intend to be limited by the diagram EC Data cites: "For purposes of explanation, specific embodiments are set forth to provide a thorough understanding of the present invention. However, it will be understood by one skilled in the art, that the invention may be practiced without these details." (Bernstein Decl., Ex. C, col. 2, lines 58-62 (emphasis added).) In light of this language, and the general principle that a court should generally not "import[] limitations

from the specification into the claims absent a clear disclaimer of claim scope," the Court will not import the processing-server limitation here. <u>Andersen</u>, 474 F.3d at 1373; <u>Trading Technologies Int'l, Inc. v. eSpeed, Inc.</u>, 595 F.3d 1340, 1354 (Fed. Cir. 2010) ("[A]n inventor must evince a 'clear intention' to limit the claim terms to a specification embodiment.")

Additionally, other evidence suggests that the term "processing server" should not be included in the definition of "message queue."  Although some claims indicate that a processing server implements the message queue, (<u>see, e.g.</u>, '688 Patent claim 10), claim 19 of the '688 Patent does not specify the hardware on which the message queue runs.  Because some claims link "message queue" to "processing server" and others do not, the pantentee evinced an intention not to impose a "processing server" limitation on all claims.  Therefore, the Court will not include "processing server" in the construction of "message queue."

Third, EC Data's states that the term "message queue" requires that multiple messages always be stored. (EC Data Op. Br. at 15-16.)  EC Data quotes a statement by the Patent Owner during reexamination of the '132 Patent that the message queue is "configured to contain <u>multiple messages</u>." (Spohn Decl. Ex. OO at 16 (emphasis in original).)  Here, EC Data focuses on the words "multiple messages" and not on the words "configured to contain." Something that is "configured" to do something need not always do that thing, but instead, need only be "set up for operation especially in a particular way." (Bernstein Suppl. Decl., Ex. Q (providing Webster's definition of "configure"); <u>see also</u> <u>Boston Scientific Corp. v. Cordis Corp.</u>, No. C 02-01474 JW, 2006 WL

16

3782840, at *2 (N.D. Cal. Dec. 20, 2006) (relying on the following dictionary definition to define "configure": "to design, arrange, set up, or shape with a view to specific applications or uses"). Accordingly, "message queue" does not include within its definition a requirement that there be multiple messages, only a requirement that the message queue be designed to hold multiple messages.[5]

**IV. Conclusion**

For the reasons set forth above, the court adopts the above claim constructions.

IT IS SO ORDERED.

Dated: September 13, 2013

DEAN D. PREGERSON
United States District Judge

---

[5] EC Data's supplemental authority to the contrary is unpersuasive. (Docket No. 69.) The supplemental authority again indicates that a message queue must be "configured" to contain multiple messages. The authority also indicates that j2 stated during reexamination that the "message queue must be able to store multiple message." (Spohn Supp. Decl. Ex. QQ at 9.) That something is able to do something, does not mean that it is always required to do it under every circumstance.

17